1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT

9                    SOUTHERN DISTRICT OF CALIFORNIA

10

11   JOHN HESS,                          Case No.:  14cv2271-CAB-JMA

12                         Plaintiff,    **ORDER: GRANTING**
                                         **DEFENDANTS' MOTION TO**
13   v.                                  **ENFORCE SETTLEMENT**
                                         **AGREEMENT FOLLOWING**
14   DAVE HANNEMAN, individually and as  **EVIDENTIARY HEARING [Doc. No.**
     Fire Chief for the City of Chula Vista;  **108] AND DISMISSING CASE**
15   JIM SANDOVAL, individually and as
     City Manager for the City of Chula Vista;
16   IRENE MOSLEY, individually and as
     Assistant Human Resources Director for
17   the City of Chula Vista;  CITY OF
     CHULA VISTA, a municipality;  CHULA
18   VISTA FIRE DEPARTMENT, an
     operating department; and DOES 1
19   THROUGH 10,
20
21
22                         Defendants.

23

24        On October 6, 2017, Defendants filed a motion to enforce settlement.  [Doc. No.

25   108, 109.]  On October 20, 2017, Plaintiff filed an opposition.  [Doc. No. 110.]  On

26   October 27, 2017, Defendants filed a reply to the opposition and/or an ex parte

27   application to allow Defendants limited discovery and an evidentiary hearing into

28   Plaintiff's declaration that he never consented to the settlement, as well as an objection to

                                         1

Plaintiff's declaration.  [Doc. No. 111, 112.]  On October 30, 2017, Plaintiff filed a response to the ex parte application.  [Doc. No. 113.]  On November 1, 2017, this Court issued an order granting in part the ex parte application and set an evidentiary hearing with regard to the motion to enforce settlement agreement, deferring a ruling on the motion until after the evidentiary hearing. [Doc. No. 114.]  The hearing was held on November 27, 2017. [Doc. No. 123.]

PROCEDURAL BACKGROUND

On April 21, 2017, a pretrial conference was held, and trial was confirmed for August 28, 2017.  [Doc. No. 95, 97.]  On August 17, 2017, the parties filed a Joint Notice of Settlement.  [Doc. No. 98.]  Due to the filing of the joint notice of settlement, the trial date set for August 28, 2017, was vacated.  [Doc. No. 99.]

On September 20, 2017, Plaintiff's counsel informed Defendant's counsel that Plaintiff was refusing to sign the settlement agreement.  [Zappia Decl. ¶21.]  On September 25, 2017, Plaintiff filed a motion to substitute attorneys, substituting Eugene Thompson in place of Michael McGill, which motion was granted.  [Doc. Nos. 102, 106.] On September 28, 2017, this Court held a status conference and set trial for January 3, 2018.  [Doc. Nos. 105, 107.]

On October 6, 2017, Defendants filed the pending motion to enforce settlement. [Doc. No. 108.]  Defendants argue the evidence is overwhelming that Plaintiff agreed to the written terms of the settlement agreement, repeatedly, and simply later refused to sign.  [Doc. No. 108 at 7.]  Plaintiff argues he never authorized his former counsel, Michael McGill, to settle the litigation for $350,000 and no resignation/retirement.  [Doc. No. 110 at 1.]

FACTUAL BACKGROUND

A.  Defendants' Proffer in the Motion.

By way of declarations in the motion, Defendants present the following evidence with regard to the settlement negotiations:

2

There have been ongoing settlement negotiations in this case since the time it was filed in September 2014.  (Zappia declaration, ¶4.)  The material settlement terms negotiated for three years pertained to: (1) an amount of money to be paid by Defendant City of Chula Vista to Plaintiff Hess; (2) whether or not Plaintiff Hess could/would be promoted to Fire Captain as part of a settlement, as he alleged wrongful failure to promote; (3) whether or not Plaintiff Hess could/would be placed in a temporary Fire Captain position until such time as he would resign or retire; (4) whether or not Hess would resign/retire as part of the settlement; (5) all parties would waive and release all claims against each other; (6) no admissions of wrongdoing by any party; and (7) dismissal of the case and the individual Defendants. (Zappia declaration ¶8; Miesfeld declaration¶¶4-5; Hanneman declaration ¶¶5-6; Sandoval declaration ¶¶5-6; Mosley declaration ¶¶5-6.)

The parties first engaged in private mediation before Judicate West in San Diego in about September 2014, near the time the lawsuit was first filed. (Zappia declaration, ¶4). On October 26, 2015, a Court-scheduled Early Neutral Evaluation Conference was held before Magistrate Judge Jan Adler. (Zappia declaration, ¶5) This was attended by all parties, all counsel, and representatives from Defendant City Attorney, City Risk Management, and a representative from the City's Joint Powers Authority from Sacramento. (Zappia declaration, ¶¶5-6.)

Between October 2015 and May 2017 there were at least three additional mediation conferences presided over by Judge Adler, but the case still did not settle. These sessions were attended by all counsel, and representatives from Defendant City Attorney, City Risk Management, and a representative from the City's Joint Powers Authority from Sacramento. (Zappia declaration, ¶¶6-7.)

Between June and August 2017 there were numerous additional settlement teleconferences initiated by Judge Adler to counsel, but the case still did not settle. (Zappia declaration, ¶7.)

3

All Defendants were always promptly advised of all settlement offers, counter-offers and settlement discussions over the past three years, as required of their counsel. ((Zappia declaration ¶¶12-17; Miesfeld declaration ¶¶4-7; Hanneman declaration ¶¶4-7; Sandoval declaration ¶¶4-7; Mosley declaration ¶¶4-7.)

By about May 2017, after nearly three years of litigation and settlement negotiations, each party had submitted their last best and final settlement offers to each other: Plaintiff's was $600,000 and no retirement/resignation; and Defendants' was $550,000 and Plaintiff would retire. (Zappia declaration ¶10.)

In about June 2017 Judge Adler initiated further settlement discussions by phone. After numerous such telephonic discussions between June and early August, no settlement was reached, and the parties were still preparing for trial on August 28, 2017. (Zappia declaration ¶11.)

On or about August 15, 2017 Magistrate Judge Adler called and informed Defendants' counsel that Plaintiff had made a new settlement offer: (1) $350,000.00; (2) but Plaintiff would not resign/retire. (Zappia declaration, ¶12, Exhibit 1.) Plaintiff's offer was confirmed in writing by Judge Adler's Clerk, in an email to Defendants' counsel dated that same day. (Zappia declaration, ¶12, Exhibit 1.)

Defendants were all promptly advised of Plaintiff's August 15, 2017 settlement offer. (Zappia declaration ¶¶12-17; Miesfeld declaration ¶¶4-7; Hanneman declaration ¶¶4-7; Sandoval declaration ¶¶4-7; Mosley declaration ¶¶4-7.).

The City agreed to/authorized the settlement agreement at its meeting that evening, on August 15, 2017. (Miesfeld declaration, ¶7.)

The City's acceptance was communicated to Judge Adler's clerk, in writing, on August 16, 2017. (Zappia declaration, ¶13, Exhibit 2.).

On August 16, 2017 at 11:22 A.M. the settlement terms were also confirmed between Defendants' and Plaintiff's counsel, in writing. (Zappia declaration, ¶14, Exhibit 3.) Plaintiff's counsel consented to the terms in writing, requesting only one revision – that this settlement agreement would have no effect on Hess's participation in a separate

4

FLSA collective action case. That revision was agreed upon, in writing. (Zappia declaration, ¶14, Exhibit 3.)

On August 17, 2017 counsel for all parties filed a "Joint Notice of Settlement." (Zappia declaration, ¶15, Exhibit 4, Document 98.)

On August 18, 2017 Plaintiff's counsel inquired when the settlement agreement would be drafted, requesting no further changes. (Zappia declaration, ¶16, Exhibit 5.)

By August 21, 2017 all Defendants had agreed to the settlement agreement, and they still agree to this day. (Zappia declaration ¶17; Miesfeld declaration ¶¶4-8; Hanneman declaration ¶¶4-8; Sandoval declaration ¶¶4-8; Mosley declaration ¶¶4-8.)

On August 24, 2017 the formal written settlement agreement was forwarded to Plaintiff's counsel. (Zappia declaration, ¶18, Exhibit 6.)

On August 25, 2017 Plaintiff's counsel requested one change to the formal settlement agreement at paragraph 2(a): to add that payment was for pain and suffering. That revision was agreed and included. (Zappia declaration, ¶19, Exhibit 7.)

Finally, on September 14, 2017 Plaintiff's counsel stated that he would have Plaintiff's signature on the settlement agreement by that day or the next. (Zappia declaration, ¶20, Exhibit 8.)

On September 20, 2017 at about 10:00 a.m., Plaintiff's counsel informed Defendants' counsel that Plaintiff Hess was now refusing to sign the settlement agreement. (Zappia declaration, ¶21.)

B.   Plaintiff's Proffer in opposition to the motion.

In opposition to the motion, Plaintiff offers the following evidence, by way of his sworn declaration:

> 4.  I was aware of settlement negotiations between my former attorney and Defendants' counsel from September 2014 to August 2017.  On October 26, 2015, I attended an Early Neutral Evaluation Conference before Magistrate Judge Jan Adler where settlement was discussed but the case did not settle.
>
> 5.  I also recall a Mandatory Settlement Conference that was held in January 2017 with myself, my former attorney, Defendants and their

counsel.  At that time, I believe that an agreement was reached to settle my lawsuit with me receiving $450,000 and being promoted to the position of Captain in the Chula Vista Fire Department.  The settlement, however, did not happen.

6.  My settlement goals have always been to be compensated for my economic and non-economic damages caused by Defendants' illegal failure to promote me to the position of Captain in the Chula Vista Fire Department.

7.  After having reviewed the Declaration of Edward P. Zappia in Support of Defendants' Motion to Enforce Settlement, I realize that I was not aware of all of the settlement negotiations being conducted between my former attorney and Defendants' counsel.

8.  At no time did I ever agree to settle this lawsuit for $350,000 and I have never signed any written document memorializing such an agreement. [Doc. No. 110-1 at 2.]

## DISCUSSION

Defendants argue the settlement should be enforced because all of the material terms were agreed to, and the circumstances show that Plaintiff provided Mr. McGill with authority to settle the case for $350,000 and no resignation/retirement.  [Doc. No. 108 at 14-17.]  Plaintiff argues there is no circumstantial or direct evidence that Plaintiff has ever agreed to accept the settlement.  [Doc. No. 110 at 2-4.]

A.  Judicial Enforcement of Settlement Agreements.

Under federal law, "[i]t is well settled that a district court has the equitable power to enforce summarily an agreement to settle a case pending before it." *Callie v. Near*, 829 F.2d 888, 890 (9th Cir.1987) (citations omitted); *TNT Marketing, INc. v. Agresti*, 796 F.2d 276, 278 (9th Cir. 1986).

To be enforced, a settlement agreement must meet two requirements. First, it must be a complete agreement. *Callie*, 829 F.2d at 890 (citations omitted). This requires that the parties have reached agreement on all material terms. *Id*. at 891. "[W]here material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." *Id*. at 890. Second, the parties "must have either agreed to the terms of the settlement or

6

authorized their respective counsel to settle the dispute." *Marks–Foreman v. Reporter Pub. Co.*, 12 F.Supp.2d 1089, 1092 (S.D.Cal.1988) (*citing Harrop v. Western Airlines, Inc.*, 550 F.2d 1143, 1144–45 (9th Cir.1977)).

A settlement agreement that is not in writing, or that, although written, is not executed by one party may be enforced under certain circumstances. *See Harrop v. Western Airlines, Inc.,* 550 F.2d 1143, 1145 (9th Cir.1977) (enforcing an oral settlement agreement*); Myles v. Nelson Staffing Solutions*, No. C 06–07792 CRB, 2007 WL 2209281, *5 (N.D.Cal. July 30, 2007) (enforcing an unsigned settlement agreement). In the absence of a signed writing, however, the moving party must demonstrate that the parties intended to be bound in the absence of a fully executed agreement. *Callie,* 829 F.2d at 890–91; *Myles*, 2007 WL 2209281 at *5.

A motion to enforce settlement is akin to a motion for summary judgment. *See In re City Equities Anaheim, Ltd*., 22 F.3d 954, 958–59 (9th Cir.1994). Summary enforcement is inappropriate where material facts concerning the existence or terms of the agreement are in dispute. *City Equities Anaheim*, 22 F.3d at 958. As a result, "[w]here material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." *Callie*, 829 F.2d at 890.

B. Whether the Parties Reached an Agreement on All Material Terms

"The formation of a settlement contract requires agreement on its material terms." *Callie,* 829 F.2d at 891 (emphasis original). For this reason, "the district court may only enforce complete settlement agreements." *Id*. at 890 (emphasis original). Here, on August 15, 2017, Mr. McGill reached out to Judge Adler to make an offer of $350,000 and no resignation/retirement (hereinafter the "August 15 offer"). Assuming Mr. McGill had his client's authority to make the August 15 offer, then the parties reached an agreement on all material terms, as Defendants immediately accepted the offer, and Mr. McGill's revisions to the settlement agreement were also accepted by Defendants. Therefore, assuming Mr. McGill

1    had authority to make the August 15 offer, the parties reached an agreement on all

2    material terms.[1]

3        C.  Counsel's authority to settle on Plaintiff's behalf.

4        Plaintiff claims he did not agree to settle for $350,000.  His claim is

5    tantamount to an assertion his attorney lacked authority to make the August 15

6    offer.

7        Federal circuit courts have taken opposite positions on what law applies to

8    determine whether a lawyer who appears in federal court was authorized to bind a

9    client to a settlement agreement. *See Schaffer v. Litton Loan Servicing, LP*, No.

10   05–07673, 2010 WL 9951762, at *9 (C.D.Cal. Oct.18, 2010) (*quoting In re*

11   *Clawson,* 434 B.R. 556, 570–71 (N.D.Cal.2010)). The Ninth Circuit has not taken

12   a position. *Id.* Some circuits hold that federal common law applies to this

13   relationship. *See Clawson*, 434 B.R. at 570–71 (collecting cases). These circuits

14   favor a presumption of the attorney's authority to bind a client to a settlement

15   agreement. *Id*. at 571. A party may rebut this presumption with evidence the

16   attorney acted outside the scope of authority. *Id.* (*citing In re Artha Management,*

17   *Inc.*, 91 F.3d 326 (2d Cir.1996)). Other circuits apply state law to the relationship.

18   *See id*. (collecting cases). They observe a uniform federal rule has not solidified;

19   modern decisions disfavor the creation of federal common law; and uniformity

20   between federal and state courts within the same state appears more important than

21   among federal courts in different states. *Anand v. California Dept. of*

22   *Developmental Services*, 626 F.Supp.2d 1061, 1065 (E.D.Cal.2009) (*citing Makins*

23   *v. District of Columbia*, 277 F.3d 544, 547–48 (D.C.Cir.2002)).

24       This court adopts the position that state law governs this determination.

25   Under California law, the rules governing the attorney-client relationship are based

26

27   _____

28   [1] Plaintiff did not dispute this finding at the evidentiary hearing.

on the general rules of agency. *Fidelity & Cas. Co. of N.Y. v. Abraham*, 70 Cal.App.2d 776, 783, 161 P.2d 689 (1945). An attorney does not have implied authority to settle by virtue of his representative role in pending litigation. *Blanton v. Womancare, In*c., 38 Cal.3d 396, 404 (1985). The client's "specific authorization" is required. *Bice v. Stevens*, 160 Cal.App.2d 222, 231–32 (Cal.Ct.App.1958). A client may, however, bind himself to the unauthorized acts of his attorney by ratifying them. *Blanton*, 38 Cal.3d at 408 (*citing Fidelity*, 70 Cal.App.2d at 783). After all, a principal may not both receive the advantages of an agreement and escape its burdens by later repudiation: "it would be unfair to allow him both to have his cake and eat it too." *Alvarado Cmty. Hosp. v. Superior Court*, 173 Cal.App.3d 476, 481(1985).

      1.  Evidence set forth in motion.

      Here, there is some circumstantial evidence of ratification.  Plaintiff was aware (as of April 2017) that trial was set for August 28, 2017.  If he did not authorize his attorney to make the August 15 offer, then presumably he would have immediately questioned why the August 28 trial date was vacated.  Instead, there is only repeated confirmation of the settlement by Mr. McGill (with two revisions to the settlement agreement) until a final document was submitted approximately one month later for Plaintiff's signature.  This is circumstantial evidence of ratification, as Plaintiff cannot receive the advantage of a settlement (a vacated trial date) and escape its burden by later repudiating it.  *Alvarado County Hosp.*, 173 Cal.App.3d at 481.

      There is also circumstantial evidence that Plaintiff did give Mr. McGill authority to make the August 15 offer.  After several rounds of unsuccessful settlement negotiations in July and August 2017, settlement negotiations had ceased and the parties were preparing for trial.  Then, after days of no settlement negotiations, Mr. McGill called Judge Adler to relay an offer before trial.  It would be highly unusual for a lawyer to reach out to the settlement judge to relay an offer

if he did not have his client's authority to do so. This was not a situation where there was frenzied settlement activity and perhaps competing offers did not get clearly communicated to the client – this was Mr. McGill reaching out after days of no settlement activity to make an offer (which was immediately accepted, thus creating a binding agreement).  Nevertheless, because Plaintiff denies having granted his attorney authority to settle for $350,000, an evidentiary hearing was required.

If a client alleges an attorney acted without authorization, the question becomes one of fact to be resolved by taking evidence. *Anand*, 626 F.Supp.2d at 1067 (citations omitted).  In this scenario the Ninth Circuit requires an evidentiary hearing. *See Callie v. Near*, 829 F.2d 888, 890 (1987) ("Where material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing."). Because Plaintiff would be bound by the settlement agreement if his counsel had authority, he bears the burden to demonstrate his attorney acted without his authority. *Anand*, 626 F.Supp.2d at 1067–68 (*citing Callen v. Pennsylvania R.R. Co.*, 332 U.S. 625 (1948)).

Moreover, by asserting that his attorney did not have authority to make the August 15 offer, Plaintiff waives the attorney client privilege at the evidentiary hearing.[2]  Under Federal common law, a litigant waives the attorney-client privilege by putting the lawyer's performance at issue during the course of litigation. *See Bittaker v. Woodford*, 331 F.3d 715, 718 (9th Cir.2003) (discussing privilege in depth when finding habeas petitioner waived attorney-client privilege by raising ineffective assistance of counsel claim). "The principle is often expressed in terms of preventing a party from using the privilege as both a shield

---

[2] The Court found a limited waiver of communications between Plaintiff and his counsel regarding the terms counsel was authorized to transmit to the defendants.

and a sword." *Bittaker*, 331 F.3d at 719; *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir.1992). Because the issue is whether Mr. McGill had his client's consent to make the August 15 offer to Defendants by way of Judge Adler, the court finds any evidence about this issue is not privileged.

　　　2.　Evidentiary Hearing.

　　　On November 27, 2017, an evidentiary hearing was held with regard to the motion to enforce settlement agreement.  Eugene Thompson, Esq., appeared on behalf of Plaintiff John Hess, who was also present and testified at the hearing. Edward Zappia, Esq. appeared on behalf of Defendants, accompanied by Bart Miesfeld, Senior Litigation City Attorney for the City of Chula Vista.  Plaintiff's former counsel, Michael McGill, was subpoenaed and testified at the hearing. Plaintiff and Mr. McGill also produced documents pursuant to a subpoena issued by Defendants (and after the Court ruled that the attorney-client privilege as to settlement negotiations had been waived or did not apply).

　　　Mr. McGill, who represented Plaintiff in this matter until September 25, 2017, testified that in or about August 14, 2017, he and Mr. Hess discussed engaging in one final round of settlement negotiations before trial.  He testified that Mr. Hess gave him authority to settle the case in the "range" of $350,000 to either $400,000 or $425,000 (and no resignation).  Mr. McGill stated he understood from those discussions with Plaintiff that Mr. McGill had authority to settle the case for a minimum of $350,000, although he would obviously try to settle it for more.  Mr. McGill testified he believed these discussions with Mr. Hess were confirmed by text, but Mr. McGill no longer possessed any such text messages.  Nevertheless, Mr. McGill testified it was his understanding from these discussions and text messages with Mr. Hess that Mr. Hess had given him authority to settle the case for a minimum of $350,000.  This was Mr. McGill's understanding when he then engaged in settlement negotiations with the Defendants via Judge Adler in or about August 14, 2017.

Mr. Hess testified that he never authorized Mr. McGill to go below $375,000.  Mr. Hess also testified that there were text messages confirming his discussions with Mr. McGill, and that Mr. Hess still possessed those text messages on his phone.  Unable to print them out, Mr. Hess presented his phone in court and the text messages were read into the record by Mr. Zappia, counsel for Defendants.[3]  The pertinent messages were as follows:

> MR. ZAPPIA:  The ones that we believe are significant.  From the city's perspective, I'll read slowly so we can get into the record.  We have a text message dated – beginning on Monday August 14, which I will represent to the Court, if you look at Exhibit 2 in the binder, is the date that Mr. McGill called the magistrate.
> At 8:36 a.m., there is a text message from Mr. Hess which says:  What are the agreements that go with it?
> Mr. McGill says:  None.
> The next text says:  So I can tell everyone that the City fucked me, then finally paid a portion that they owed me, and continue with my book on my three years running the union.
> Mr. McGill:  Yes.  Except you are getting more than the what the City owes you, but pretty much.
> Mr. Hess:  Not after fees.  What is the offer?
> Mr. McGill:  400-, but worse case, 350-.
> Mr. Hess:  And if the City says no, you kick ass and win it for me?
> Mr. McGill:  Yes.
> Mr. Hess:  An I will put 100 percent effort into the next captains test. If they pass me over, and they will, do you automatically represent me in that case?
> Mr. McGill:  If you test well and they pass you over, for sure.
> Mr. Hess:  Even if the union fights it?  Because as long as Darryl is on the board, they will fight it and not support me.
> Mr. McGill:  They won't fight it.  They may not support it, but they won't fight it.
> Mr. Hess:  They cost me the last settlement.  How do I trust them?
> Mr. McGill:  You don't have to trust them.  You trust me.  They will not fight me repping you do future litigation if I tell them your claim is righteous.  So are we good?

---

[3] Plaintiff had no objection to the reading or the accuracy of the record.

Mr. Hess:  Try to keep it above $375,000.  This has taken a toll on my family that we cannot recover from, and no one seems to care, especially the union.

Mr. McGill:  I'm going to do my best to get it to 400-.

. . .

MR. ZAPPIA:  And then we were down to August 16 at 3:06 p.m., Mr. McGill:  Just heard from the magistrate judge.  We have a settlement at 350k.  Congrats.  I know you are going to say you knew it would settle at the low end.  But I was literally going back and forth with the judge every day, and we squeezed every dime out of them.

Now Wednesday August 16 at 4:45, Mr. Hess:  Fuck.  I told you that would be it.  Shit, shit, shit.

Mr. McGill:  Be happy.  This is a win.

Mr. Hess:  No, it's not.

Mr. Hess:  This is just tentative at this point, correct?

Mr. McGill:  We are going to write up written agreement, but it's done.  It is a win.  The settlement amount is in line with damages.  That's what cases like this are wirth.  Worth.  Liability has nothing to with damages the severity of their harm has nothing to do with what compensable damages are.

Mr. Hess:  it's all bullshit.  As usual, I get the short end.  That's why I was so against the 350-.  That why I wanted you to hold it to 375-.

Mr. McGill:  I'm coming down there, and we are going to have a beer, and I will explain how you are not getting the short end.

3.   Findings of fact.

As set forth at the evidentiary hearing, this Court finds that Mr. Hess authorized Mr. McGill to settle the matter in the range of $350,000 to $400,000.  Mr. McGill testified that he understood from the discussions and texts with Mr. Hess that Mr. Hess had authorized Mr. McGill to settle the case in the range of $350,000 to $400,000 or $425,000.  While Mr. Hess testified that he told Mr. McGill not to go below $375,000, the text messages on Mr. Hess' phone demonstrate that Mr. Hess did understand the low end of the range to be $350,000:

Mr. Hess:  Not after fees.  What is the offer?

Mr. McGill:  400-, but worse case, 350-.

Mr. Hess:  And if the City says no, you kick ass and win it for me?

Mr. McGill:  Yes.

While Mr. Hess did express a preference to keep it above $375,000, the fact that he said "try to keep it above $375,000" further demonstrates that Mr. Hess knew of the possibility that the ultimate settlement could be lower.  Mr. Hess again demonstrated his knowledge and acquiescence of the $350,000 settlement amount when, after learning of the City's acceptance of the $350,000 settlement offer, he stated:

> Mr. Hess:  Fuck.  I told you that would be it.  Shit, shit, shit.

The "it" undoubtedly refers to the low end of the authorized range of $350,000 - $400,000.

Finally, the text messages contradict Mr. Hess' statement in his declaration in opposition to the motion to enforce the settlement wherein he states he was "not aware of all of the settlement negotiations being conducted between my former attorney and Defendants' counsel."  [Doc. No. 110-1 at ¶7.]  Mr. Hess' own text messages show that Mr. McGill was keeping him apprised of settlement negotiations up to August 14, 2017, the date Mr. McGill called Judge Adler on behalf of Mr. Hess.

## CONCLUSION

For the reasons set forth above and at the evidentiary hearing, Defendants' motion to enforce the settlement agreement is **GRANTED**.  The case is **DISMISSED**.   The Clerk of the Court shall **CLOSE** the case.

**IT IS SO ORDERED**.

Dated:  December 4, 2017

_____
Hon. Cathy Ann Bencivengo
United States District Judge